

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-23-00003-CR

———————————————

Ex parte Jay Allen Rotter

On Appeal from the 211th District Court
Denton County, Texas
Trial Court No. F20-2507-431

Before Kerr, Birdwell, and Womack, JJ.
Memorandum Opinion by Justice Womack

# MEMORANDUM OPINION

## I. INTRODUCTION

Prior to opening statements at Appellant Jay Allen Rotter's murder trial, the State informed the trial court that it had in its possession video from Detective Rodney Mooneyham's body camera that had not been turned over to Rotter during discovery. After viewing the body camera footage, Rotter filed a motion for mistrial, which the trial court granted. Rotter later filed a pretrial application for writ of habeas corpus, arguing that the indictment against him should be dismissed due to violations of double jeopardy and due process. The trial court denied his application. In two issues on appeal, Rotter argues that the trial court abused its discretion by failing to grant him habeas relief based on alleged violations of double jeopardy and due process. We will affirm.

## II. BACKGROUND

### A. Police respond to a call concerning the shooting death of Rotter's girlfriend; responding officers' body camera footage is uploaded to evidence.com and is accessible by the Denton County District Attorney's Office.

On the evening of August 26, 2020, Rotter called 911 and reported that his girlfriend, Leslie Hartman,[1] had just shot herself at their residence. Law enforcement officers, including Detective Rodney Mooneyham, Detective David Bearden, Detective Tommy Potts, Sergeant Michael McIntire, and Sergeant Eric Beckwith,

---

[1]At the time of her death, Hartman was a wheelchair-bound paraplegic.

responded to the scene, where they found Hartman deceased on the floor of a bedroom with a gunshot wound to the side of her head. They also noticed what appeared to be blood inside of a bathroom located across from the bedroom and blood on Rotter's body and clothing.

Each of those officers—with the exception of Detective Potts[2]—wore body cameras that night. When the officers returned to the police station, they placed their body cameras into a docking station, where videos from their body cameras were automatically uploaded onto a server referred to as evidence.com.[3] From there, an administrative assistant with the Denton County District Attorney's Office did intake of the body camera videos, where she accepted the videos into the e-file discovery system of the District Attorney's Office. She later testified that, as of November 3, 2020, the body camera videos were accessible by the District Attorney's Office.

## B. Rotter is indicted, and discovery is exchanged.

On November 20, 2020, Rotter was indicted for Hartman's murder.[4] Over the ensuing months, the Denton County District Attorney's Office exchanged discovery

---

[2]Detective Potts testified that he was not wearing his body camera because he was not on call that night and "wasn't expecting to be called out to the scene."

[3]A records supervisor for the Denton Police Department testified that evidence.com is a portal used by Denton police officers to hold evidence provided to them.

[4]Detective Mooneyham was the only witness presented to the grand jury. There is no record of his testimony during the grand jury proceedings. Detective

relating to the case with Rotter's counsel. Among other exchanges between prosecutors and Rotter's counsel regarding discovery, on August 31, 2022, Michael Graves, the lead prosecutor on the case, wrote to Rotter's counsel, "I was able to successfully transfer the entire Jay Rotter file from my hard drive to your hard drive last night. I've left it for you at the front desk." Included in the discovery exchanged was a report detailing Detective Mooneyham's event summary regarding the night of Hartman's death, as well as his theory outlining that Rotter had shot Hartman.

## C. Rotter's trial begins; the prosecution realizes that Detective Mooneyham's body camera footage has not been turned over to Rotter; and Rotter asks for and receives a mistrial.

Rotter's murder trial began on October 3, 2022, when a jury was selected and sworn. When the trial reconvened the next morning, Graves informed the trial court that the State had in its possession footage from Detective Mooneyham's body camera that had not been turned over to Rotter during discovery. Graves indicated that the footage was approximately three hours long, that the trial should be briefly continued so that Rotter's counsel could review the footage, and that the State's "goal" was to start the trial in the afternoon. The trial court recessed the jury until the afternoon to give Rotter's counsel time to review the footage.

After reviewing the footage, Rotter filed a motion for mistrial that same day, arguing that "the [d]efense has identified new and key pieces of evidence" and that

Mooneyham also testified at a February 2, 2021 hearing on Rotter's "Motion to Reduce Bonds." The record contains a transcript of that hearing.

4

"the defense has developed a trial strategy for this case that is now incompatible with the newly discovered evidence." Rotter indicated that his "voir dire would have been significantly different had [he] previously known about the evidence handed over today" and that "further consultation with experts is needed with the possible need for additional witnesses." When the trial court reconvened that afternoon, it granted Rotter's motion for mistrial.

**D.     Rotter files a pretrial application for habeas corpus; the State responds; and the trial court denies Rotter's application.**

On December 2, 2022, Rotter filed his pretrial application for writ of habeas corpus. In that application, Rotter complained about the State's untimely disclosure of Detective Mooneyham's body camera footage. Rotter also mentioned that, subsequent to the mistrial, the State had informed him that a video from Sergeant Beckwith's body camera had not been timely disclosed and that "an unseen body camera video of Sergeant McIntire had been inadvertently destroyed."[5] Rotter argued that further prosecution against him should be barred by double jeopardy. He also argued that his right to due process had been irreparably violated, noting that Detective Mooneyham had passed away in October 2021—after Rotter was indicted

---

[5]As to the footage from his body camera, Sergeant McIntire testified that whenever body camera video is uploaded onto evidence.com it is "purged" after 241 days unless the evidence is "categorized." Sergeant McIntire stated that he did not "categorize" the footage from his body camera, noting that the responsibility for "categorizing" the footage "would be either whoever was compiling the case or generally whoever is eFiling it."

but before Detective Mooneyham's body camera footage was disclosed to him—and that he would not be able to question Detective Mooneyham about the footage.[6]

The State later responded to Rotter's pretrial application for habeas corpus, arguing that Rotter's application should be denied because there was no intentional prosecutorial misconduct and that his due-process complaint is not cognizable. The State attached to its response an affidavit from Graves and an affidavit from Sarah Wood, the second-chair prosecutor on the case.

In his affidavit, Graves stated that in November 2020, he requested that Detective Mooneyham copy the Denton Police Department's entire case file regarding Rotter onto an external hard drive for Graves to copy. Graves explained that he had made this request because the District Attorney's Office's "e-file discovery system was still fairly new . . . and when voluminous files were being e-filed with [his] office, it was hard to confirm that everything was properly downloaded." Graves stated that in December 2020, he was provided the external hard drive for the Rotter case; that he copied it to his own external hard drive; and that he "copied the

---

[6]In that footage, Detective Mooneyham can be seen entering Hartman's house around 1:07 a.m. on August 27, 2020. Approximately a minute-and-a-half after he entered the house, Detective Mooneyham viewed the bedroom where Hartman's body was located; approximately twenty seconds later, he viewed the bathroom across the hall from the bedroom; and approximately thirty seconds later, he theorized that Hartman had been shot in the bathroom. In his application for habeas relief, Rotter contends that he would have questioned Detective Mooneyham about "why the detective believed, within minutes of investigating the scene, that [Rotter] had committed a murder in the bathroom, then moved [Hartman] to the adjacent bedroom and staged the scene to appear she had died there."

contents of the Jay Rotter file from [his] external hard drive, in their entirety, onto an external hard drive provided by the defense." Graves stated that in "early 2021," he compared what was on his external hard drive to what had been e-filed in the e-file discovery system by going "line by line [to] check each file to make sure that every file on [the] e-file system was also on the external hard drive that was copied for defense counsel." Despite that effort, Graves "missed that there were body cam videos from Detective Mooneyham on e-file that were not on the external hard drive and therefore not provided to defense counsel." In his affidavit, Graves maintained that this "was an honest and unintentional mistake" and was not done "in an attempt to hide or conceal evidence."

Graves further explained that as he was preparing for trial on October 4, 2022, he had reviewed Detective Mooneyham's report and noticed that the report mentioned Detective Mooneyham's body camera. Graves stated that he found this odd because he had never seen Detective Mooneyham's body camera footage and because, according to Graves, "[d]etectives normally don't wear body cams." In his affidavit, Graves explained that after he noticed the reference to Detective Mooneyham's body camera, he contacted Detective Potts to research whether Detective Mooneyham's footage had been e-filed with prosecutors. After Detective Potts found that Detective Mooneyham's body camera footage had been e-filed with prosecutors, Graves "immediately disclosed this to defense counsel and to the Court,"

and a copy of the body camera footage was "quickly copied and provided for defense [counsel] to review."

In her affidavit, Wood stated that she was not involved in the discovery process, noting that Graves, as the lead prosecutor, was assigned that role. She explained that while she had on occasion accessed the case using the District Attorney's Office's e-file discovery system, she had also downloaded a copy of the case file from Graves and worked from that copy during the pre-trial process. She indicated that she had thought that the file she downloaded from Graves included "the complete discovery" and that she "had no actual knowledge that the State was in possession of videos that had not been turned over to [Rotter] until the morning of October 4, 2022."

After conducting a hearing on Rotter's pretrial application for habeas corpus, the trial court signed an order denying the application. This appeal followed.

## III. DISCUSSION

### A. Standard of Review

We review the trial court's ruling on a pretrial application for writ of habeas corpus for an abuse of discretion. *Ex parte Gonzalez*, 525 S.W.3d 342, 346 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *Ex parte Paxton*, 493 S.W.3d 292, 297 (Tex. App.—Dallas 2016, pet. ref'd). We view the evidence in the light most favorable to the trial court's ruling and uphold it absent an abuse of discretion. *Ex parte Wheeler*, 203 S.W.3d 317, 324 (Tex. Crim. App. 2006). If resolving the ultimate

8

question turns on applying legal standards, we review the trial court's determination de novo. *Paxton*, 493 S.W.3d at 297.

## B. Rotter's Double-Jeopardy Complaint

In his first issue, Rotter argues that the trial court abused its discretion by failing to grant him habeas relief based on an alleged violation of double jeopardy.

### 1. The Law

The Fifth Amendment of the United States Constitution provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The Texas Constitution similarly provides that "[n]o person, for the same offence, shall be twice put in jeopardy of life or liberty, nor shall a person be again put upon trial for the same offence, after a verdict of not guilty in a court of competent jurisdiction."[7] Tex. Const. art. I, § 14. These double jeopardy provisions protect a criminal defendant from repeated prosecutions for the same criminal offense. *See Oregon v. Kennedy*, 456 U.S. 667, 671, 102 S. Ct. 2083, 2087 (1982); *Ex parte Adams*, 586 S.W.3d 1, 4 (Tex. Crim. App. 2019).

---

[7]"Conceptually, the state and federal double jeopardy provisions are identical, and the Texas [C]onstitution does not afford any different or greater protections in this regard than does the Fifth Amendment." *Ex parte Bennett*, 245 S.W.3d 616, 618 (Tex. App.—Fort Worth 2008, pet. ref'd); *see Ex parte Hill*, 464 S.W.3d 444, 446 (Tex. App.—Dallas 2015, pet. ref'd) ("The Texas Constitution's prohibition against double jeopardy provides substantially identical protection to the Double Jeopardy Clause of the United States Constitution.").

In cases tried before a jury, a defendant is placed in jeopardy when the jury is empaneled and sworn. *Ex parte Roberson*, 455 S.W.3d 257, 260 (Tex. App.—Fort Worth 2015, pet. ref'd). Because jeopardy attaches before the judgment becomes final, double jeopardy provisions also embrace the defendant's "valued right to have his trial completed by a particular tribunal." *Arizona v. Washington*, 434 U.S. 497, 503, 98 S. Ct. 824, 829 (1978); *Wade v. Hunter*, 336 U.S. 684, 689, 69 S. Ct. 834, 837 (1949).

Double jeopardy is generally not violated when a criminal defendant deliberately elects to forgo his right to have his guilt or innocence determined before the first trier of fact by voluntarily moving for and receiving a mistrial. *Ex parte Rodriguez*, No. 02-13-00085-CR, 2014 WL 2142536, at *1 (Tex. App.—Fort Worth May 22, 2014, no pet.) (mem. op., not designated for publication) (citing *Kennedy*, 456 U.S. at 676, 102 S. Ct. at 2089). "There is a narrow exception to this general rule that occurs when the prosecution engages in conduct intended to 'provoke' or 'goad' the defendant into moving for a mistrial." *Id.* (first citing *Kennedy*, 456 U.S. at 675–76, 102 S. Ct. at 2089, 2091; then citing *Ex parte Lewis*, 219 S.W.3d 335, 371 (Tex. Crim. App. 2007); and then citing *Ex parte Masonheimer*, 220 S.W.3d 494, 507 (Tex. Crim. App. 2007)).

The Texas Court of Criminal Appeals has provided the following list of non-exclusive factors for courts to consider in assessing whether a prosecutor intended to "provoke" or "goad" the defendant into moving for a mistrial:

1) Was the misconduct a reaction to abort a trial that was "going badly for the State?"  In other words, at the time that the prosecutor acted, did it reasonably appear that the defendant would likely obtain an acquittal?

2) Was the misconduct repeated despite admonitions from the trial court?

3) Did the prosecutor provide a reasonable, "good faith" explanation for the conduct?

4) Was the conduct "clearly erroneous"?

5) Was there a legally or factually plausible basis for the conduct, despite its ultimate impropriety?

6) Were the prosecutor's actions leading up to the mistrial consistent with inadvertence, lack of judgment, or negligence, or were they consistent with intentional or reckless misconduct?

*Wheeler*, 203 S.W.3d at 323–24.

## 2.    Application of the Law to the Facts

First, as to whether the State's misconduct was a reaction to abort a trial that was "going badly for the State"—in other words, whether it reasonably appeared that Rotter would likely obtain an acquittal at the time that the prosecutor acted—we note that the State disclosed Detective Mooneyham's body camera footage prior to opening statements at Rotter's trial.[8]  Thus, because no evidence had been presented to the jury, we cannot say that Rotter would have likely obtained an acquittal but for

---

[8]The parties spend significant portions of their respective briefs arguing whether the untimely-disclosed footage constitutes *Brady* material.  *See Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 1197 (1963).  We will assume without deciding that the footage constitutes *Brady* material.

11

the prosecutor's actions.[9] *See Ex parte McCord*, No. 10-21-00267-CR, 2022 WL 7208998, at *7 (Tex. App.—Waco Oct. 12, 2022, no pet.) (mem. op., not designated for publication) (holding that there was nothing in the record indicating that the State's discovery efforts were designed to abort a trial that was going badly for the State where, at the time the motion for mistrial was granted, "no witnesses had been called and no evidence had been admitted"); *State v. Rushing*, No. 09-16-00423-CR, 2017 WL 4182316, at *8 (Tex. App.—Beaumont Sept. 20, 2017, pet. ref'd) (not designated for publication) ("The fact that the mistrial occurred at a very early stage in the proceedings further supports our view that double jeopardy does not bar Rushing from being retried.").

Second, as to whether the misconduct was repeated despite admonitions from the trial court, the record reflects that the State turned over the footage from Detective Mooneyham's body camera to Rotter as soon as the State realized that such discovery had not been previously disclosed, and the State promptly brought the

---

[9]In his brief, Rotter argues that "it is reasonable that [he] was likely to obtain an acquittal." But Rotter points to no evidence that had been presented to the jury at his trial; instead, he simply makes general allusions—without citations to the record—of what the evidence at trial would have shown. With respect to a pretrial application for habeas corpus, "[i]t is the applicant's obligation to provide a sufficient record that supports his factual allegations with proof by a preponderance of the evidence." *Ex parte Chandler*, 182 S.W.3d 350, 353 n.2 (Tex. Crim. App. 2005). Here, Rotter has not provided a sufficient record to support his allegation that he was likely to obtain an acquittal but for the State's actions. *See Ex parte Coleman*, 350 S.W.3d 155, 160 (Tex. App.—San Antonio 2011, no pet.) ("The burden is on the applicant to prove his allegations by a preponderance of the evidence.").

matter to the trial court's attention. During a subsequent audit of the discovery materials turned over to Rotter, the State discovered that a video from Sergeant Beckwith's body camera had not been previously disclosed and that footage from Sergeant McIntire's body camera had been inadvertently destroyed, and the State informed Rotter of those facts. *See Roberson*, 455 S.W.3d at 262 (holding that there was nothing in the record to suggest that prosecutor or investigator had repeatedly engaged in misconduct in defiance of trial court's admonitions where investigator "made one mistake, [and he] brought the mistake to the prosecutor's attention promptly, and the prosecutor immediately took the matter up with the court").

Third through fifth, as to whether the prosecution provided a reasonable, good-faith explanation for its conduct, along with whether the conduct was clearly erroneous or whether there was a legally or factually plausible basis for the conduct, Graves explained that he had requested that Detective Mooneyham copy the Denton Police Department's case file regarding Rotter onto an external hard drive because the e-file discovery system used by the Denton County District Attorney's Office was "still fairly new" and because "it was hard to confirm that everything was properly downloaded" onto the system. Graves stated that he provided a copy of that external hard drive to Rotter's counsel and that he later made an attempt to compare what was on the external hard drive to what had been e-filed in the e-file discovery system.

Graves maintained that his failure to timely disclose the footage from Detective Mooneyham's body camera "was an honest and unintentional mistake" and was not

13

done "in an attempt to hide or conceal evidence." He also explained that as soon as he realized that the State had the footage in its possession, he "immediately disclosed this to defense counsel and to the Court," and a copy of the body camera footage was "quickly copied and provided for defense [counsel] to review." For her part, Wood stated that she had worked from a copy of the case file that she had obtained from Graves and that she "had no actual knowledge that the State was in possession of videos that had not been turned over to [Rotter] until the morning of October 4, 2022." The trial court could have found that Graves and Wood provided a reasonable, good-faith explanation for their conduct; that such conduct was not clearly erroneous; and that there was a factually plausible basis for their conduct. *See id.* at 263 (holding that trial court could have found that investigator gave a reasonable, good-faith explanation for speaking with juror based on investigator's mistake as to juror's identity; that investigator gave a plausible basis for his conduct; and that investigator had made an "honest mistake").

Sixth, as to whether the State's actions leading up to the mistrial were consistent with inadvertence, lack of judgment, or negligence, or whether they were consistent with intentional or reckless misconduct, the trial court could have concluded that the untimely disclosure of the body camera videos was the result of a lack of judgment and negligence—providing Rotter's counsel with a copy of the external hard drive thought to contain all discovery materials rather than the materials contained on the e-file discovery system and failing to accurately verify that the

14

external hard drive contained all discovery materials. Such lack of judgment and negligence, however, do not bar a retrial. *See Ex parte Lopez*, No. 2-06-232-CR, 2007 WL 1776061, at *3 (Tex. App.—Fort Worth June 21, 2007, pet. ref'd) (mem. op., not designated for publication) (holding that State's failure to disclose two videos until after trial had started, which led to a mistrial, was a "prosecutorial blunder that was the result of inadvertence, sloppiness, or even simple negligence, none of which are bars to retrial").

Viewing the evidence in the light most favorable to the trial court's order, we cannot say that the prosecution engaged in conduct intended to "provoke" or "goad" Rotter into moving for a mistrial. *See Ex parte Watson*, No. 01-19-00637-CR, 2020 WL 7517453, at *8–9 (Tex. App.—Houston [1st Dist.] Dec. 22, 2020, no pet.) (per curiam) (mem. op., not designated for publication) (affirming trial court's denial of pretrial application for writ of habeas corpus where, after jury had been empaneled but prior to opening statements, the State discovered that footage from an officer's dash camera had not been turned over to the defense, and "[a]s soon as the State learned of the video, it alerted [appellant's] counsel, told him the State would burn him a copy of the footage the same day and bring it to him, and offered to let him watch the video while it was being copied"); *Ex parte Duke*, No. 05-15-00047-CR, 2015 WL 1636724, at *2 (Tex. App.—Dallas Apr. 10, 2015, no pet.) (mem. op., not designated for publication) (holding that "[t]he record shows no prosecutorial misconduct intended to goad appellant into requesting a mistrial" where the record

15

showed that game warden turned over to prosecutor on the morning of trial an audio CD of radio traffic exchanged during chase of appellant's boat). Thus, the trial court did not abuse its discretion by denying Rotter's pretrial application for habeas corpus based on the alleged violation of double jeopardy. *See Rodriguez*, 2014 WL 2142536, at *1. We overrule Rotter's first issue.

## C.    Rotter's Due-Process Complaint

In his second issue, Rotter argues that the trial court abused its discretion by failing to grant him habeas relief based on an alleged irreparable violation of due process.

### 1.    Is Rotter's due-process complaint cognizable?

Pretrial habeas, followed by an interlocutory appeal, is an "extraordinary remedy," and we must be careful to ensure that a pretrial writ is not misused to secure pretrial appellate review of matters that should not be put before the appellate courts at the pretrial stage. *Ex parte Ellis*, 309 S.W.3d 71, 79 (Tex. Crim App. 2010); *Gonzalez*, 525 S.W.3d at 346. An applicant may seek pretrial habeas relief "only in very limited circumstances."[10] *Ex parte Smith*, 178 S.W.3d 797, 801 (Tex. Crim. App.

---

[10]One such "limited circumstance" is when an applicant alleges that double jeopardy has been violated. *See Ex parte Weise*, 55 S.W.3d 617, 619 (Tex. Crim. App. 2001) ("We have held that an applicant may use pretrial writs to assert his or her constitutional protections with respect to double jeopardy and bail."); *Ex parte Culver*, 932 S.W.2d 207, 210 (Tex. App.—El Paso 1996, pet. ref'd) ("[A] defendant may raise by pretrial habeas corpus claims concerning double jeopardy, collateral estoppel[,] and bail, because if he were not allowed to do so, those protections would be effectively undermined.").

2005). The purpose of an application for writ of habeas corpus is to remove an illegal restraint on an applicant's liberty. *See* Tex. Code Crim. Proc. Ann. art. 11.01. Thus, pretrial habeas relief is reserved for cases in which resolution of a legal issue in the applicant's favor must result in the applicant's immediate release. *Ex parte Ingram*, 533 S.W.3d 887, 892 (Tex. Crim. App. 2017). Moreover, pretrial habeas relief is generally unavailable when the resolution of a claim may be aided by the development of a record at trial. *Id.* (citing *Weise*, 55 S.W.3d at 620).

Whether a claim is cognizable on pretrial habeas is a threshold issue that should be addressed before the merits of the claim may be resolved. *Ellis*, 309 S.W.3d at 79; *see Weise*, 55 S.W.3d at 619. If we conclude that the grounds asserted in the application for writ of habeas corpus are not cognizable, then we must affirm the trial court's denial of relief. *Ex parte Walsh*, 530 S.W.3d 774, 778 (Tex. App.—Fort Worth 2017, no pet.); *Ex parte Schoolcraft*, 107 S.W.3d 674, 676 (Tex. App.—San Antonio 2003, no pet.).

We have previously held that "[d]ue process claims are not generally cognizable for pretrial habeas relief." *Walsh*, 530 S.W.3d at 778. Other Texas courts have held similarly. *See, e.g., Ex parte Cooper*, No. 04-20-00038-CR, 2020 WL 2736459, at *2 (Tex. App.—San Antonio May 27, 2020, pet. ref'd) (mem. op., not designated for publication) ("Due process claims are not cognizable for pretrial habeas relief because such claims are not tied to a right against prosecution, and an appeal provides an adequate remedy for such claims after conviction."); *Ex parte Guerrero*, No. 05-06-

17

1316-CR, 2006 WL 3718339, at *3 (Tex. App.—Dallas Dec. 19, 2006, pet. ref'd) (not designated for publication) ("Due process claims are not generally cognizable by pretrial habeas corpus."); *In re Shaw*, 204 S.W.3d 9, 16 (Tex. App.—Texarkana 2006, pet. ref'd) ("[A] defendant may not use pretrial habeas corpus to assert his or her constitutional rights to due process. Due process claims, therefore, are not cognizable on a pretrial application for habeas relief.") (citations omitted); *Culver*, 932 S.W.2d at 210 ("Because of the existence of an adequate remedy by appeal, a defendant may not use pretrial habeas corpus to assert his constitutional rights to a speedy trial or due process."). We see no reason to depart from this clear precedent. We overrule Rotter's second issue because his due-process complaint is not cognizable. *See Ellis*, 309 S.W.3d at 79; *Walsh*, 530 S.W.3d at 778.

### 2. Even if Rotter's due-process complaint is cognizable, did the trial court abuse its discretion by not dismissing Rotter's indictment?

Even if we were to assume that Rotter's due-process complaint is cognizable, we still would have to consider whether the trial court abused its discretion by not dismissing Rotter's indictment due to an alleged irreparable violation of due process. To that end, Rotter argues that because Detective Mooneyham had passed away before the disclosure of the detective's body camera videos, he lost the opportunity to cross-examine Detective Mooneyham regarding the videos.

"The dismissal of an indictment is a 'drastic measure' only to be used in the 'most extraordinary circumstances.'" *Walsh*, 530 S.W.3d at 779 (quoting *State v.*

*Mungia*, 119 S.W.3d 814, 817 (Tex. Crim. App. 2003)). And, generally, "an indictment may not be challenged in a pretrial application for writ of habeas corpus." *Id.* (citing *Ex parte Matthews*, 873 S.W.2d 40, 42 (Tex. Crim. App. 1994)).

Here, Rotter had the opportunity to ask Detective Mooneyham questions about his theory of the case—i.e., that Rotter had shot Hartman rather than Hartman having committed suicide—at the February 2, 2021 hearing on Rotter's "Motion to Reduce Bonds." At a subsequent trial, Rotter will presumably have the opportunity to ask other Denton police officers about that theory and about the subject body camera footage. Moreover, body camera footage from other officers responding to the scene was timely disclosed to Rotter. Apart from Detective Mooneyham's statement theorizing that Hartman had been shot in the bathroom, Rotter points us to nothing in the untimely-disclosed footage that would stand out from the timely-disclosed footage. And we fail to see how the untimely disclosure of that one statement would necessitate the dismissal of Rotter's indictment. *See Mungia*, 119 S.W.3d at 817; *Walsh*, 530 S.W.3d at 779.

Viewing the record in the light most favorable to the trial court's order, we cannot say that the "most extraordinary circumstances" were presented here by the untimely disclosure of Detective Mooneyham's body camera footage and his subsequent death such that Rotter's indictment should be dismissed. *See Walsh*, 530 S.W.3d at 778 ("None of appellant's arguments in the trial court convince us that if he is correct on the underlying legal issues asserted within his amended

19

application . . . he is entitled to immediate release from confinement through dismissal of his indictments and is therefore entitled to relief through habeas corpus."). Thus, even if Rotter's due-process complaint is cognizable, we would still overrule Rotter's second issue because we cannot say that the trial court abused its discretion by failing to dismiss Rotter's indictment.

## IV. CONCLUSION

Having overruled Rotter's two issues, we affirm the trial court's order denying relief on Rotter's pretrial application for writ of habeas corpus.

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: May 11, 2023

20